NOT DESIGNATED FOR PUBLICATION

No. 122,919

COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.H. and G.H.,
Minor Children.

MEMORANDUM OPINION

Appeal from Phillips District Court; PAULA D. HOFAKER, judge. Opinion filed December 18, 2020. Affirmed in part and dismissed in part.

*S. Scott Sage*, Sage & Sage Law Office, of Phillipsburg, for appellant natural father.

*Melissa M. Schoen*, county attorney, for appellee.

*Aronda L. Strutt*, of Stockton, guardian ad litem.

Before GARDNER, P.J., BUSER and BRUNS, JJ.

PER CURIAM: Father appeals the termination of his paternal rights to his children M.H. and G.H., challenging the district court's findings regarding his unfitness and the best interests of the children. Father also argues that the district court erred by not appointing a permanent custodian. Finding no error, we affirm.

*Factual and Procedural History*

*Father's Incarceration*

In the summer of 2016, Father was arrested on rape and assault charges in Pennsylvania. He was released on bond in February 2017 but was later convicted of aggravated indecent assault and indecent assault without consent in violation of 18 Pa. Stat. § 3125(a)(1) and 18 Pa. Stat. § 3126(a)(1). In November 2018, a Pennsylvania state court sentenced Father to a minimum of three years and six months and a maximum of seven years in prison. He was sent to State Correctional Institution-Phoenix in Collegeville, Pennsylvania to serve his sentence. According to Father, his earliest release date is in March 2021. By then, M.H. will be about 2 months shy of 18 years old and G.H. will be 15 years old. If Father remains in prison until September 2024, however, M.H. will be 21 years old and G.H. will be 18.

*The Children's Early Life and Time with Father*

M.H. and G.H. were born in Philadelphia, Pennsylvania. M.H.—born June 3, 2003—and G.H.—born December 4, 2005—lived with their Mother, Father, and older sister until 2012, when Father moved out. Mother, M.H., and G.H. continued to live in Pennsylvania until September 2017 when they moved to Kansas to live with the children's maternal grandmother (Grandmother).

But troubles arose in Kansas. In May 2018, Grandmother obtained a protection from abuse order against Mother to protect Grandmother, Grandmother's partner (L.K.), and the children. Mother moved out, but M.H. and G.H. continued to live with Grandmother and remained in her care. In May 2019, Mother died.

*CINC Proceedings*

The underlying children in need of care (CINC) petition was filed before Mother died and in response to Mother's May 2018 acts which led Grandmother to seek a protection from abuse order against her. The State filed its petition after L.K. reported that Mother was drunk most days and had broken a window on Grandmother's home while drunk and out of control. Based on that incident, Mother was arrested and charged with criminal damage to property and domestic battery, and Grandmother got the protection from abuse order. The district court ordered the children to be placed in the Department for Children and Families' (DCF) temporary care. DCF, through its contracting provider Saint Francis Children Services (SFCS), placed the children with Grandmother.

Mother pleaded no contest to the CINC petition. The district court adjudicated M.H. and G.H. CINC and approved a permanency plan with the goal of reintegration. The district court found that Mother tested positive for alcohol the day of the adjudication hearing, but that Mother had moved to Riley, Kansas, was employed, and had housing.

By April 2019, Mother was discussing a guardianship agreement in which M.H. and G.H. would stay with Grandmother and L.K., and Mother would keep the children over weekends. Upon learning of these discussions, the court added a goal of custodianship to the reintegration plan. But neither reintegration nor a custodianship was achieved before Mother died on May 22, 2019. After Grandmother notified SFCS of Mother's death, SFCS asked the district court to move forward with termination proceedings against Father to ensure the children were able to achieve permanency in a timely manner.

On May 23, the State issued a summons for Father. On May 24, the district court appointed S. Scott Sage as Father's attorney. On May 28, Meagan Eiland, an SFCS case

3

worker, sent Father a letter telling him that he had an attorney and that because the children's Mother had died, the State was seeking to terminate his parental rights. She also told Father the children were doing well and wished to stay with Grandmother. Eiland gave Father her contact information and asked him to respond. Soon after, Sage sent Father notice of the permanency hearing set for June 4.

Father did not appear at that permanency hearing. Still, the district court found that due to Mother's passing, reintegration was no longer viable, so it changed the permanency plan to adoption or permanent custodianship. Because Father was not listed as father on the children's birth certificates, the district court ordered DCF and SFCS to investigate his paternity, and it scheduled a review hearing for August 2019.

Eiland sent additional letters to Father, requesting that he contact her. She sent Father similar letters monthly from June to December, but Father did not respond to any of them.

Nor did Father respond to his attorney's efforts to contact him. Although he had not heard from Father, Sage appeared on Father's behalf at the August 2019 review hearing. He then wrote Father and told him that the district court was exploring whether to move forward with termination proceedings or to consider a permanent custodianship. Sage explained that a permanent custodianship would allow Father to keep his parental rights and the children would remain in Grandmother's care. Sage enclosed two copies of consent forms and encouraged Father to seriously consider voluntarily agreeing to the custodianship.

In late August, Sage received an email from someone at Father's prison stating Father had received the documents but adamantly refused to "sign over his rights to his daughter[s]." But in September, Father seemingly changed course—he wrote Sage a letter stating he would consider letting Grandmother have temporary custody of his daughters if

4

he would regain custody of them upon his release from prison. Sage notified Father that incarceration did not excuse Father's parental duties to support, bond with, and contact the children. Sage also told Father that the district court would likely terminate his parental rights and again encouraged Father to sign the consent forms allowing the appointment of a permanent custodian. Father did not take Sage's advice.

Sage received another email stating Father had received the paperwork, but he emphatically refused to sign the forms. Thus, the case proceeded to a hearing on the State's motion for a finding of unfitness and termination of Father's parental rights.

*Termination Proceedings*

The State's motion to terminate Father's parental rights to M.H. and G.H. alleged Father was unfit and unlikely to change in the foreseeable future based on these allegations:

- Mother was deceased;
- Before her death, Mother agreed it would be in the children's best interests to allow Grandmother to take Guardianship of the children;
- The children were in favor of staying with Grandmother;
- Father had not contacted the children in over a year;
- Father was incarcerated for up to seven years on one count of aggravated indecent assault and one count of indecent assault; and
- Father refused to consent to a guardianship with Grandmother.

Father filed an affidavit objecting to termination. The district court recognized Father's paternity, noted his objection to termination, and set the matter for a termination hearing on March 5, 2020.

5

*Termination Hearing*

The district court allowed Father to participate in the termination hearing by telephone, and Father did so. He testified three times and was able to speak with Sage privately.

Father testified that it had been around five or six years since the children had lived in his home and under his care. When Father was sent to prison in 2017, Mother took the children to live in Kansas against his wishes. Father described the move as "kidnapping" and said Mother had prohibited him from contacting the children.

Yet Father admitted that he did not seek legal intervention so he could contact the children and admitted that he had not paid child support at any time. Father also admitted that he had not contacted his daughters for at least two-and-one-half years and had not seen or spoken to them in person, by phone, or over Skype during that time. Father sent the children one letter in December 2019, yet he wrote to his mother about three times a month.

Father testified that he did not have a job in prison, so he had no income. He thought, however, that he could provide for the children financially if he got some insurance money from Mother's death benefits and got disability benefits in Kansas. He testified that he and the children could live with his mother at her Pennsylvania home, which was large enough for all of them.

Father pleaded to keep his children, maintaining that he loved them. Father claimed that he had been a stay-at-home father for years because Mother was busy working. But Father acknowledged that he would not be able to parent his children until he was released from prison.

6

Grandmother's and the children's testimony painted a different picture of the children's upbringing with Father at home. All three described Father as a violent man, and M.H. testified that Father may have had a drug problem.

Grandmother testified that the children were doing very well in her care—a sentiment Eiland agreed with. Grandmother said that the girls got along with L.K., that he enjoyed having them in the home, that the children were a "joy to have," and that they were welcome to stay in her home as long as they wanted. On cross-examination, Grandmother candidly admitted that she did not like Father and had not had contact with him since 2012, when he "tried to kill [her] daughter." In describing that event, Grandmother testified that when she was staying at Mother's house, Father had violated a restraining order by assaulting Mother—he pulled her by her hair and threw her over a railing outside her house.

M.H. and G.H. also described an event in 2012 when Father abused their Mother. M.H. testified that she was aware that Father had tried to kill her Mother when he pulled her down a set of concrete stairs and pushed her over the railing into a rose bush. G.H. testified that she had seen other abuse, including when Father would "beat" Mother and blacken her eyes. G.H. also testified that once, when her oldest sister had tried to intervene when Father was abusing Mother, Father had tried to break her sister's leg. Grandmother testified that G.H.'s recent recall of the abuse was causing her emotional difficulties. Both Grandmother and G.H. testified that G.H. was attending counseling, which was helping.

Both children testified that they last saw Father in June 2016, when he stopped by to drop off a birthday gift for M.H. From 2012 to 2016, they visited Father two to four times a year, and maybe for a week during their 2015 Christmas break. Other than that, Father sent the girls one letter on December 20, 2019. M.H. read it but G.H. did not. The

7

children had occasionally communicated with their paternal grandmother, but she had not shared the children's contact information with Father.

Both children testified that they would not feel safe in Father's care and no longer wanted to have contact with him. Both felt safe and happy in Grandmother's care and wanted to keep living with her.

Father testified again after Grandmother and the children testified, to respond to their allegations. With regard to the 2012 incident, Father testified that he had pleaded guilty to domestic battery. But Father said that he had abused Mother only because her diabetes and bipolar disorder caused her to get angry and verbally and physically abusive, implying that he had hurt her in self-defense.

The State admitted a certified copy of Father's criminal docket, complaint, and 2018 sentencing order from the Pennsylvania court. In addition to other charges, Father had been charged with attempted rape. The charges were later amended to include aggravated indecent assault without consent, indecent assault without the consent of others, indecent exposure, simple assault, and unlawful restraint/serious bodily injury. The jury convicted Father of aggravated indecent assault without consent and indecent assault without consent but acquitted him of simple assault. The State had dismissed the remaining charges before trial.

At the termination hearing, the district court took judicial notice of the Pennsylvania statutes under which Father was convicted. Those statutes define the perpetrator of aggravated indecent assault as:

> "[A] person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith

8

medical, hygienic or law enforcement procedures commits aggravated indecent assault if . . . the person does so without the complainant's consent." 18 Pa. Stat. § 3125(a)(1).

The statutes define the elements of indecent assault as:

"A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and . . . the person does so without the complainant's consent." 18 Pa. Stat. § 3126(a)(1).

After being convicted of these crimes, Father was sentenced to a minimum of three years and six months and a maximum of seven years in prison, plus two years supervised probation.

In its closing argument, the State requested termination based on Father's incarceration and general lack of support and contact with the children. The State also argued that a presumption of unfitness applied because Father's crimes were comparable to Kansas' rape statutes. See K.S.A. 2019 Supp. 38-2271(a)(12).

Defense counsel emphasized that Father was sentenced to a maximum of only seven years—a much lower sentence than is typical for a rape conviction in Kansas. Defense counsel asked the district court to allow Father to retain his parental rights and suggested that Father was open to the idea of a permanent custodianship. Father requested 20 to 30 days to "seriously consider" whether to consent to Grandmother's appointment as the children's permanent custodian.

Eiland proposed that custodianship was the best means of addressing M.H. and G.H.'s needs. A custodianship would provide the children with permanence sooner than termination would, and the girls would not need an adoption subsidy to help financially

because they were receiving death benefits. Eiland also explained that Father could consent to the custodianship or the district court could simply order it—either way, it was in the children's best interests to remain in Grandmother's care.

The attorney representing Grandmother agreed that termination of Father's parental rights was in the children's best interests. Grandmother's counsel also argued that a presumption of unfitness existed because Father had failed to assume parental duties for at least the last two-and-one-half years. See K.S.A. 2019 Supp. 38-2271(a)(13). The guardian ad litem joined in those arguments and added that the children had been subjected to abuse from a young age and that their testimony likely resulted in additional trauma.

The district court took the matter under advisement. Roughly two weeks after the hearing, the district court found by clear and convincing evidence that Father was "unfit by reason of conduct and condition which render the parent unable to care properly for the children and the conduct or condition is unlikely to change in the foreseeable future." The court stated the many factors that it relied on in finding Father unfit.

Finally, the district court found that "taking into consideration the physical, mental and emotional health and needs of the children, termination of parental rights is in the best interests of each child. K.S.A. 38-2269(g)(1)." It explained:

> "The Court makes this finding based upon numerous factors, including but not limited to the fact that the children have no bond with Father and the children do not want to have contact with Father; Father could be in prison up to the year 2025; he has had no contact with the children, or even attempted to have contact with the children while in prison; and he made no discernible effort to change his circumstances so that he could reintegrate with his children, either before he went to prison or after."

Thus, the district court denied Father's request for a continuance to consider a custodianship and terminated Father's parental rights.

Father timely appeals.

*Analysis*

A parent has a constitutional protected liberty interest in the relationship with his or her child. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (stating the interest of parents in the care, custody, and control of their children is a fundamental liberty interest); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, the State may terminate the legal bonds between parent and child only upon "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a).

If the district court makes such a finding, it must then consider whether termination is in the best interests of the child. The court's primary concern here is the physical, mental, and emotional health of the child. K.S.A. 2019 Supp. 38-2269(g)(1). Whether the termination of parental rights is in a child's best interests is based on a preponderance of the evidence and we review that finding for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A district court abuses its discretion when no reasonable person would agree with its decision or when the decision stems from a legal or factual error. *In re M.S.*, 56 Kan. App. 2d 1247, 1255, 447 P.3d 994 (2019); see *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Father contends the district court erred in both its unfitness finding and its best interests finding. We find, however, that clear and convincing evidence supports the

unfitness decision, and that the district court did not abuse its discretion in finding termination was in the children's best interests.

I. *The District Court Did Not Err in Finding Father Unfit.*

"When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's right should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

K.S.A. 2019 Supp. 38-2269(a) provides that, once the district court has adjudicated a child as CINC, the district court may terminate a parent's right by a finding of unfitness. K.S.A. 2019 Supp. 38-2269(b) contains a nonexclusive list of factors for the district court to consider when determining if a parent is unfit. K.S.A. 2019 Supp. 38-2269(c) contains additional factors to consider when the child is not in the physical custody of a parent. Any one of the factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2019 Supp. 38-2269(f).

The district court relied on the following statutory factors to find Father unfit to parent M.H. and G.H.:

- Father was imprisoned on a felony conviction. K.S.A. 2019 Supp. 38-2269(b)(5).
- Appropriate agencies made reasonable efforts to rehabilitate the family but failed when Father failed to respond to or participate in these efforts. K.S.A. 2019 Supp 38-2269(b)(7).

- Father lacked effort to adjust his circumstances, conduct, or condition to meet the children's needs. K.S.A. 2019 Supp. 38-2269(b)(8).
- The children were not in Father's custody and Father failed to maintain regular visitation, contact, or communication with the children. K.S.A. 2019 Supp. 38-2269(c)(2).
- The children were not in Father's custody and Father failed to pay a reasonable portion of the substitute physical care and maintenance based on ability to pay. K.S.A. 2019 Supp. 38-2269(c)(4).

The district court also relied on two statutory presumptions of unfitness in terminating Father's parental rights:

- Father failed to assume the duties of a parent for two consecutive years next preceding the filing of the petition. K.S.A. 2019 Supp. 38-2271(a)(13); see K.S.A. 60-414(a).
- Father made no reasonable efforts to support or communicate with the children within the last five to six years. See K.S.A. 2019 Supp. 38-2271(a)(9); see also K.S.A. 60-414(a); K.S.A. 2019 Supp. 38-2271(b).

We address each in turn.

*1. Felony conviction and incarceration*

Father concedes that he is incarcerated and that his earliest release date is in March 2021. But Father implies that he was not convicted of a felony or that the State failed to prove that fact. But the record squarely refutes Father's position.

Father admitted that he was incarcerated based on a conviction for aggravated indecent assault without consent. The district court took judicial notice of the

Pennsylvania statute defining that offense—18 Pa. Stat. § 3125(a)(1). According to the statute, that offense is a second-degree felony. 18 Pa. Stat. § 3125(c)(1). The State admitted several supporting documents, including a sentencing order showing that Father was convicted and incarcerated for that offense. The record thus fully supports the district court's finding. It is irrelevant that Father objected to the admission of these documents or that Father gave an alternate account of the facts underlying his criminal case.

The record also supports the district court's consideration of Father's imprisonment as a negative factor. Imprisonment may serve as a mitigating factor if it limits the parent's ability to fulfill their customary parental duties. See *In re S.D.*, 41 Kan. App. 2d 780, 789-90, 204 P.3d 1182 (2009). But imprisonment serves as a mitigating factor only when a parent has made an effort to carry out parental duties and has thus made "reasonable attempts to contact and maintain an ongoing relationship with his or her children." *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987); see also *In re S.D.*, 41 Kan. App. 2d at 789-90 (applying analysis in termination of parental rights case). Father did not do so here.

Imprisonment may constitute a significant negative factor where, as here, "it has impeded the development of a relationship between the parent and the child . . . and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests." *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 337 P.3d 711 (2014).

Father presented no evidence showing his imprisonment should be considered a mitigating factor or that he made any effort to contact or maintain a relationship with M.H. or G.H. since he was incarcerated. Instead, Father excuses his lack of effort by casting blame. He suggests that his physical disabilities limited his ability to write to the children, that Mother refused to allow Father to contact them, and that prison regulations made it almost impossible to do so. Yet, Father admitted that he writes to his mother three times a month. And he admitted that he never sought legal means to try to get

14

visitation or some other contact with the children. Eiland testified that Father never asked SFCS for contact with the children. And the State presented evidence that Father's imprisonment has delayed the children's ability to obtain permanency with Grandmother.

The record shows clear and convincing evidence that Father's incarceration made him unfit to care properly for the children—now and in the foreseeable future.

2. *Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate family*

K.S.A. 2019 Supp. 38-2269(b)(7) requires the relevant agencies to try to achieve, within reason, rehabilitation of the family. But this factor does not "'require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan.'" *In re A.Z.*, No. 119,217, 2019 WL 638271, at *7 (Kan. App. 2019) (unpublished opinion); *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion).

Father maintains that SFCS exerted little effort to correspond with him and that SFCS's meager efforts were exacerbated by difficulties with the Pennsylvania penal system's communication procedures. So Father asserts that SFCS's efforts did not amount to the "reasonable efforts" the statute requires.

The district court found that Eiland sent Father "at least eight letters . . . from December 10, 2018 to January 9, 2020 in an attempt to make contact with Father and to get information from him." Yet Father responded only once and "made no attempt to find out what he needed to do to have contact with the children or how to fulfill any requirements under the case plan he admits he received."

The record confirms that Eiland made efforts to locate and contact Father before and after the State moved to terminate his parental rights. Despite SFCS's failed attempts to correspond with Father, SFCS assigned Father case plan tasks, thus providing Father a means of establishing a relationship with the children. But Father chose not to respond or to participate in SFCS's efforts, despite having received a copy of the case plan. Had Father engaged in the services SFCS provided him, he may have been able to at least communicate with the children. But Eiland's efforts to include Father failed because Father chose not to do so. The State also showed that Father made minimal attempts to respond to his attorney and ignored his attorney's advice to consider the benefits of consenting to a permanent custodianship.

Under our standard of review, we do not reweigh the evidence but view the record in the light most favorable to the State. See *In re B.D.-Y.*, 286 Kan. at 705. Viewed in that light, the record shows clear and convincing evidence that the agency made reasonable, yet unsuccessful, efforts to initiate or foster a relationship between Father and the children. See *In re I.H.*, No. 122,554, 2020 WL 3885920, at *7-8 (Kan. App. 2020) (unpublished opinion) (finding reasonable efforts factor applicable in case involving incarcerated father failing to establish a relationship with children).

3. *Lack of effort to adjust circumstances, conduct, or condition to meet the needs of the children*

Father argues that the district court's finding under K.S.A. 2019 Supp. 38-2269(b)(8) of "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child" was wrong and ambiguous. He assumes that the district court's reasoning was highly influenced by his incarceration and argues that led to an unfair result.

16

Throughout its statement of facts, the district court referenced examples of ways Father failed to adjust his circumstances, conduct, or condition. The district court noted that Father's incarceration prevented him from assuming a parental role. Father testified that he did not have a job in prison and thus did not make an income. Yet when Father was not incarcerated, he received around $800 per month in disability payments but had not used any of that money to support his children. Father justified this by saying he "had to worry about [him]self at that time."

The district court also referenced Father's abuse of Mother and his conviction of a sex-based felony. Father presented no evidence to show he was taking steps to address those behaviors.

Father does not point to specific actions he has taken to adjust his circumstances, conduct, or condition. He simply argues that his incarceration substantially inhibits his ability to freely communicate with SFCS. By narrowly focusing on his imprisonment, Father ignores that the statute is disjunctive and thus allows for arguments about a change in circumstances, conduct, *or* condition. See *In re I.H.*, 2020 WL 3885920, at *8. So even if Father's incarceration substantially limited his ability to change his circumstances or condition, Father could still have shown his efforts to change his conduct. But the record shows none. We find that the record shows by clear and convincing evidence that Father's lack of effort made Father unfit to parent the children and that Father will not put forth the necessary effort in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a), (b)(8).

> 4. *Failure to maintain regular visitation, contact, or communication with the children or with the custodian of the children*

Because the children were not in Father's physical custody, the court was required to consider additional factors set out in K.S.A. 2019 Supp. 38-2269(c). Father argues that the district court's finding that he "fail[ed] to maintain regular visitation, contact or

17

communication with the children or with the custodian of the children" was erroneous because he was not at fault for not seeing or speaking with the children over the last several years. See K.S.A. 2019 Supp. 38-2269(c)(2). Instead, Father asserts that his incarceration and Mother were to blame for his complete lack of contact with the children. Father points to the one letter he sent the children as evidence that once Mother died, he tried to contact them. Father also emphasizes that the children's current custodian, Grandmother, despised him.

We recognize that Father's imprisonment likely added barriers to visitation, contact, and communication with the children. But Father's imprisonment did not preclude him from making some effort to communicate with the children. The record shows that Father—through his mother—sent the children a letter in December 2019, while incarcerated. Although Father testified that he was physically unable to write the children letters due to injuries from a car accident, he managed to write to his mother regularly. Father admitted that he did not write the children because they did not write back: "I got no response. Really, it's hard to write letters when you get no response." And the children testified that other than the 2019 letter, Father's last attempt to contact them occurred in June 2016, when Father dropped off a birthday gift for M.H. At best, these events are incidental contacts, which the district court has discretion to disregard. See K.S.A. 2019 Supp. 38-2269(c).

Father admittedly did not try to contact Mother, Grandmother, or Eiland to request an address, visitation, or any other form of communication. Nor did he take legal action to try to maintain a relationship with the children after they moved to Kansas. And Father saw the children 10 times at most between 2012 to 2016, before he was imprisoned.

Thus, clear and convincing evidence supports the district court's finding that Father failed to maintain regular visitation, contact, or communication with the children or their custodians. See *In re K.F.W.*, No. 119,335, 2019 WL 257886, at *7 (Kan. App.)

18

(unpublished opinion), *rev. denied* 309 Kan. 1348 (2019) (upholding application of this factor where Father testified he sent occasional letters, drawings, and spoke over the phone with child). Father's history of failing to maintain contact while inside and outside prison supports the district court's finding that Father's conduct is unlikely to change in the foreseeable future.

5. *Failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay*

Father asserts that the district court erred by relying on his failure to pay a reasonable portion of the cost of substitute physical care and maintenance for the children, see K.S.A. 2019 Supp. 38-2269(c)(4), because he was never required to pay child support in Kansas before the CINC petition was filed. But this factor may be found even when a parent has never been ordered to pay child support. Father also contends that he lacked the ability to pay support because he is disabled and has not received disability payments since being incarcerated. But even if we assume that Father was unable to contribute financially while incarcerated, the record still supports this factor.

Father did not pay child support from 2012 to 2016. That was before his incarceration and when Father was receiving disability payments of $800 per month. Yet he did not pay any support because he "had to worry about [him]self at that time." Father's testimony that he does not work in prison because of his disability supports the district court's finding that Father's failure to pay support for the children is unlikely to change in the foreseeable future. Father could be released from prison as early as March 2021 or as late as 2024. Although Father's plan after he gets out of prison is to collect death benefits from his deceased ex-wife and disability benefits in Kansas, where he has never lived or worked, Father provided no evidence that he is likely to receive either of those sources of income.

19

Accordingly, clear and convincing evidence supports the district court's finding that Father's failure to make reasonable support payments rendered him unfit to properly care for the children, now and in the foreseeable future.

Because we have found clear and convincing evidence that Father is unfit under K.S.A. 2019 Supp. 38-2269(a)-(c), we need not examine whether the district court erred in applying the presumptions of fitness in K.S.A. 2019 Supp. 38-2271(a).

II.  *Best Interests of the Children*

We review the district court's finding that termination of parental rights is in the best interests of the children for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d at 1115-16.

The district court heard testimony about Father's abuse of Mother and one of his older children. It took judicial notice of Father's felony sex offenses for which he was still incarcerated. The children testified that they feared Father, and M.H. testified that she feared that she could become a victim of Father's abuse. Grandmother testified that the children were doing very well in her care, and Eiland agreed. Both children testified that they would not feel safe in Father's care and no longer wanted to have contact with him. Both felt safe and happy in Grandmother's care and wanted to keep living with her.

Father emphasizes Eiland's testimony that the appointment of a permanent custodian would likely result in a timelier means of providing the children with permanency and was thus in the children's best interests. From this, Father asserts that a permanent custodianship—not termination—aligned more appropriately with the children's best interests. But Eiland also explained that whether or not Father consented to the custodianship, it was in the children's best interests to remain in Grandmother's

20

care. This and other evidence discussed above shows that the district court did not abuse its discretion in finding termination was in the best interests of the children.

III.     *The District Court Did Not Err in Terminating Father's Parental Rights Instead of Appointing a Permanent Custodian While Leaving Father's Rights Intact.*

Father's second claim on appeal is that the district court erred in terminating his parental rights instead of appointing a permanent custodian. Father does not argue that the district court erred by denying his request for a continuance to reconsider whether to consent to a voluntary appointment of a permanent custodianship.

*Legal Standards*

Father's argument raises issues of statutory interpretation and jurisdiction. We have unlimited review over both. *State v. Chavez*, 310 Kan. 421, 425, 447 P.3d 364 (2019); *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017). Our statutes give the district court discretion to appoint a permanent custodian before or after termination of parental rights. K.S.A. 2019 Supp. 38-2269(a) states:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights *or* appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." (Emphasis added.)

K.S.A. 2019 Supp. 38-2269(g)(1) and (2) provide additional guidance:

> "If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to

21

the physical, mental and emotional health of the child. *If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order. . . .*

"If the court terminates parental rights, the court *may* authorize adoption pursuant to K.S.A. 2019 Supp. 38-2270, and amendments thereto, appointment of a permanent custodian pursuant to K.S.A. 2019 Supp. 38-2272, and amendments thereto, *or* continued permanency planning." (Emphases added.)

Father contends that when read *in pari materia* with the "entire statutory scheme" regarding placement after a finding of unfitness, K.S.A. 2019 Supp. 38-2269(g)(2) required that the district court review all of its statutory options—including the appointment of a permanent custodian—before terminating Father's parental rights. But we cannot address Father's claim because we do not have jurisdiction over this issue.

An appellate court has a duty to question jurisdiction on its own initiative. When the record discloses a lack of jurisdiction, the appellate court must dismiss the appeal. *Wiechman v. Huddleston*, 304 Kan. 80, 84-85, 370 P.3d 1194 (2016).

Recently, a panel of this court outlined the relevant law on this issue:

"The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statutes. *Wiechman*, 304 Kan. at 86-87.

"The revised Kansas Code for Care of Children has a separate jurisdiction statute, K.S.A. 2019 Supp. 38-2273(a), which provides: 'An appeal may be taken by any party or interested party from any order of temporary custody, adjudication, disposition, finding of unfitness or termination of parental rights.' According to our Supreme Court, '[t]he statute creates five categories of appealable orders in a [child in need of care] case.' *In re T.S.*, 308 Kan. 306, 310, 419 P.3d 1159 (2018).

22

"In *In re T.S.*, the Supreme Court held that 'any . . . order . . . of termination of parental rights' meant 'an order that ends parental rights, and nothing more.' 308 Kan. at 312. As a result, our Supreme Court dismissed a grandfather's cross-appeal of a district court ruling that appointed a permanent custodian rather than granting a motion to terminate parental rights. The Supreme Court reasoned that the plain language of the statute permitted an appeal of the termination of parental rights but not an appeal of the district court's *refusal* to terminate parental rights. 308 Kan. at 312. In this holding our Supreme Court specifically declined 'to create a new category of [child in need of care] appeals where the Legislature has declined to do so.' 308 Kan. at 312.

"The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). In analyzing a statute, we must first ascertain legislative intent [through] the statutory language enacted, giving common words their ordinary meanings. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

"A plain reading of K.S.A. 2019 Supp. 38-2273(a), in concert with *In re T.S.*, yields the conclusion that the Legislature did not intend to provide Kansas appellate courts with jurisdiction to review a district court's ruling creating a permanent custodianship for children in need of care. Accordingly, this portion of Father's appeal is dismissed for lack of jurisdiction." *In re D.M.*, No. 122,561, 2020 WL 5490880, at *9-10 (Kan. App. 2020) (unpublished opinion).

The same applies here.

Because we have already affirmed the district court's findings that Father is unfit, Father's unfitness is not likely to change in the foreseeable future, and termination of Father's parental rights was in the best interests of the children, any analysis regarding the district court's decision to appoint a permanent custodian would rest on matters made after the court's termination decision. The record shows that the district court held a review hearing after Father's parental rights were terminated. In that hearing, the district

23

court announced its intent to move forward with a permanent custodianship with Grandmother. But we do not have jurisdiction to consider that post-termination hearing or the resulting order. See *In re N.A.C.*, 299 Kan. 1100, 1121, 329 P.3d 458 (2014) (certain post-termination orders are not subject to appellate review).

To the extent that Father's argument rests on the district court's termination order, Father still fails to provide a basis for reversal. First, Father's argument rests on language in K.S.A. 2019 Supp. 38-2271(b)—the statute prescribing circumstances of presumptive unfitness. But we have upheld the district court's decision based on non-presumptive factors in K.S.A. 2019 Supp. 38-2269(b)-(c). Second, Father's interpretation of K.S.A. 2019 Supp. 38-2269(g)(2) goes beyond the plain language of the statute, and we decline Father's invitation to read into the statute language that goes beyond the plain text.

Third, Father assumes that the district court did not consider permanent custodianship in deciding to terminate his parental rights, yet the record does not support that assumption. The district court heard several arguments regarding permanent custodianship at trial. The State and defense counsel put the district court on notice that Father had been given time to consider consenting to a voluntary appointment of a permanent custodian. So the record establishes that the district court likely considered all the options available based on the evidence presented. If it found it in the children's best interests to retain Father's parental rights, the district court was authorized to appoint a permanent custodian without terminating Father's parental rights. See K.S.A. 2019 Supp. 38-2269(g)(3). But the district court determined that termination was in the children's best interests. That decision was sound and clearly authorized under K.S.A. 2019 Supp. 38-2269(a). Any decision beyond that is outside the purview of the termination order and thus outside our jurisdiction. We dismiss this portion of Father's appeal.

Affirmed in part and dismissed in part.

24